PHILLIP A. TALBERT
United States Attorney
CHI SOO KIM
ALYSON A. BERG
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBYN HOLLOWAY and STERLING HOLLOWAY, | CASE NO. 2:12-cv-02120 MCE-CKD |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | **(Fed. R. Civ. P. 52(a))** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

A bench trial in this Federal Tort Claims Act ("FTCA") action began on February 8, 2017. Plaintiffs Robyn Holloway and Sterling Holloway rested their case on February 28, 2017. The United States then made an oral motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). After the Court heard argument on the Rule 52(c) motion from both sides, the Court ordered the parties to submit findings of fact and conclusions of law/ briefs focused on causation, which were filed by the parties on March 3, 2017. [ECF Nos. 154, 155] The Court held a second hearing on March 6, 2017, heard oral argument from both sides, and orally granted the Government's motion.

///

///

///

Having carefully reviewed the evidence, the written submissions, and argument, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[1]

## I.    LEGAL STANDARD[2]

When "a party has been fully heard" on an issue tried to the court, the court may enter judgment against the party.  Fed. R. Civ. P. 52(c).  Unlike Rule 50(a) motions for judgment as a matter of law, however, in deciding Rule 52(c) motions the "district court is not required to draw any inferences in favor of the non-moving party; rather, the district court may make findings in accordance with its own view of the evidence."  *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006) (affirming grant of Rule 52(c) motion for judgment on partial findings for government in FTCA case); *see also Warren v. United States*, 999 F.2d 546, *2 (9th Cir. 1993) (affirming grant of Rule 52(c) motion for judgment on partial findings in FTCA case) (unpublished).  "Rule 52(c) expressly authorizes the district judge to resolve disputed issues of fact."  *Ritchie*, 451 F.3d at 1023.  "The failure of a party to establish an essential issue justifies the immediate termination of the case or claim.  Judgment on partial findings conserves time and resources…."  *Gannon v. United States*, 571 F. Supp. 2d 615, 618 (E.D. Pa. 2007) (granting government's Rule 52(c) motion in FTCA case because the plaintiffs failed to meet their burden to prove causation), *aff'd*, 292 F. App'x 170 (3d Cir. 2008) (quoting Moore's Federal Practice ¶ 52.50 (3d ed. 2007)).

---

[1]  On March 10, 2017, Plaintiffs informed the United States that they were not

[2]  At the first hearing on the United States' Rule 52(c) motion for judgment on partial findings and again in their opposition, Plaintiffs argued that there is ample evidence to find negligence.  Pls. Opp. [ECF No. 154].  This is the wrong legal standard and has been expressly rejected by the Ninth Circuit.  *Ritchie v. United States*, 451 F.3d 1019, 1022-23 (9th Cir. 2006).  A legally sufficient evidentiary basis is the standard under Rule 50(a) for judgment as a matter of law in jury trials.  "The standards that govern judgment as a matter of law in a jury case have no bearing on a decision under Rule 52(c)."  Fed. R. Civ. P. 52(c) adv. comm. 2007 note.  Rule 52(c) applies to bench trials such as this one.

## II.    FINDINGS OF FACT[3]

### A.    BACKGROUND

1.    In 2007, the Air Force and All Power, Inc., a California corporation, entered into an agreement to repair and improve the B Street Substation, an electrical substation on Beale Air Force Base, which is located near Marysville, California. Raccoons entered the B Street Substation, making contact with the electrical equipment, damaging the equipment, and shutting down the power at the substation, which impacted base operations. The contract was modified to add the construction of a "raccoon proof" wall to prevent further damage to the electrical equipment. (Undisputed Fact No. 1 [ECF No. 98 at 4])

2.    The B Street Substation provides power to mission critical functions and real-time intelligence and military operations. The B Street Substation distributes electricity and powers the main part of the Beale Air Force Base, including (but not limited to) intelligence facilities, communications facilities, Global Hawk, base command functions, Security Forces, Civil Engineering, and various base support facilities. Due to its mission critical function, the B Street Substation remains energized and was energized during the construction of the block wall on the outside of the substation. (Undisputed Fact No. 2 [ECF No. 98 at 4]; Barker, Phillips Trial Testimony[4])

3.    In September and October 2011, Plaintiff Robyn Holloway, Plaintiff Sterling Holloway, Cheyenne Sinkola, and Blake Wolfswinkel were employees of All Power. Sterling Holloway is Robyn Holloway's half-brother. Wolfswinkel began working for All Power in 2004 as a foreman. Sterling Holloway began working for All Power as a masonry tender in August 2010. Robyn Holloway and Sinkola began working for All Power in September 2011. (Undisputed Fact No. 4 [ECF No. 98 at 4]; S. Holloway, R. Holloway, Sinkola, Wolfswinkel Tr.)

---

[3]    "To the extent that any of the Findings of Facts may be deemed Conclusions of Law, they also shall be considered conclusions. Likewise, to the extent that any of the Conclusions of Law may be deemed Findings of Fact, they shall be considered findings." *United States v. Newmont USA Ltd.*, 2008 WL 4621566, *2 n.1 (E.D. Wash. Oct. 17, 2008) (citing *Miller v. Fenton*, 474 U.S. 104, 113-14 (1985) (noting the difficulty, at times, of distinguishing findings of facts from conclusions of law)).

[4] Trial testimony is abbreviated as "Tr."

4.      All Power selected Wolfswinkel to be the supervisor-foreman for the construction of the wall around the B Street Substation.  All Power's Project Manager, Rob Anderson, selected which All Power employees would work on the B Street wall with Wolfswinkel, selecting Plaintiffs and Sinkola.  Wolfswinkel assigned tasks to Sterling, Robyn, and Sinkola for the construction of the wall.  All Power set the crew's work schedule.  (Undisputed Fact No. 5 [ECF No. 98 at 4-5]; Wolfswinkel, Sinkola Tr.)

5.      Construction of the wall began in September 2011.  Due to rain, the All Power crew (Wolfswinkel, Plaintiffs, and Sinkola) only worked four days in October 2011 before the accident: October 3, 12, 13, and 14, 2011.  (R. Holloway, S. Holloway, Sinkola, Wolfswinkel Tr.; Exhs. 20, G at 9-12)

6.      All of the construction tools used for building the B Street Substation wall were All Power's tools, including the rebar bender.  The United States did not provide Plaintiffs with uniforms, rebar, or a rebar bender while they were working on the construction of the wall.  (Undisputed Fact No. 6 [ECF No. 98 at 5]; Hughes, Sinkola, Wolfswinkel Tr.; Exh. I)

7.      All Power had the responsibility for overall safety of the job site as well as the safety of All Power's employees.  This standard construction industry practice has important policy interests because the duplication of responsibility for overall job site safety is not within the best interest of the public and can create confusion for All Power's employees.  As part of its safety responsibilities, All Power was required to train its employees on safety.  (Hughes Tr.)

8.      As the foreman for the B Street wall, Wolfswinkel was responsible for enforcing all job site safety related matters.  Wolfswinkel was also responsible for supervising Sterling Holloway, Robyn Holloway, and Sinkola for safety.  Wolfswinkel gave common sense instructions to his crew to be careful working around high voltage.  (Wolfswinkel, Hughes Tr.)

9.      All Power held weekly safety meetings that were mandatory for All Power employees to attend.  All Power also held daily safety meetings (called "tailgate" meetings) at the B Street wall construction job site, including a safety meeting on October 3, 2011 for high voltage dangers.  The Air Force never attended any All Power safety meetings.  (Wolfswinkel, Sinkola Tr.; Exh. G at 9)

10.     The B Street Substation wall being constructed was approximately 95 feet long on the west and east sides and approximately 100 feet long or longer on the north and south sides. All Power placed a temporary fence around the outside of where the wall was being built so that the temporary fence enclosed the entire wall area. All Power foreman Wolfswinkel and Project Manager Anderson decided where to place the temporary fence, placing it approximately 15 feet away from the perimeter of the wall.[5] The total area enclosed inside the temporary fence was approximately 12,650 square feet (110 feet x 115 feet). (Giorgi, Wolfswinkel, Sinkola, Hughes Tr.; Exh. C)

11.     Wolfswinkel, Plaintiffs, and Sinkola knew that the substation was energized while they were working on the wall. This was "common knowledge" to the entire All Power crew. (Wolfswinkel, Sinkola, R. Holloway Tr.; Exh. G at 9)

12.     Rebar is a steel rod that provides reinforcement and was required for building the wall. Rebar comes in different lengths and widths. On or around September 20, 2011, all the rebar for the B Street wall construction was provided and delivered by Camblin Steel on one truck. Initially, the rebar was stored in the field south of the B Street Substation. Wolfswinkel and All Power's head mason, Kim Holloway, decided to store the rebar upon delivery in the field because there was no foot traffic in the field. They did not consult with anyone before selecting this location. (Undisputed Fact No. 3 [ECF No. 98 at 4]; Exh. B-3 (wall design required the placement of rebar within the wall at multiple stages of construction); Wolfswinkel Tr.; Exhs. G at 6, K-1)

13.     In October 2011, Staff Sergeant Brian Giorgi was an Air Force Construction Inspector. Giorgi joined the Air Force in 2003 and was assigned in 2007 to Beale as a Construction Inspector. Plaintiffs claim that on Thursday, October 13, or Friday, October 14, 2011, Staff Sergeant Giorgi instructed Wolfswinkel to move rebar to the inside of the temporary fence surrounding the B Street Substation. Wolfswinkel testified that Giorgi instructed him to get the rebar out of the field south of the substation because there was lots of foot traffic in the field. Giorgi denies this allegation. (Giorgi, Wolfswinkel Tr.)

_____

[5] "Wall perimeter" or "perimeter of the wall" is used to refer to the location where the wall was being built (i.e., the wooden forms placed in the trench as shown in Exh. D-20 herein).

14.     Because All Power ordered pre-bent rebar for use in the wall, bending rebar was not expected for the construction of the wall.  (Wolfswinkel, Hughes Tr.)

15.     As a result, the first time rebar was bent for the wall construction was the rebar that was bent causing the accident on October 17, 2011.  This rebar was bent because All Power discovered an unanticipated culvert in the trench dug for the wall and the rebar would be placed in the trench over this culvert.  (R. Holloway, Sinkola, Giorgi, Wolfswinkel, Hughes Tr.)

16.     Wolfswinkel assigned tasks to Sterling, Robyn, and Cheyenne for the construction of the wall.  The task of bending rebar to go over the unanticipated culvert was assigned to Sinkola.  (S. Holloway, R. Holloway, Sinkola, Wolfswinkel, Hughes Tr.)

17.     Before the accident, Sinkola had never bent rebar or used a rebar bender.  Sinkola had no training on how to use a rebar bender.  Wolfswinkel never showed Sinkola how to use a rebar bender or how to bend rebar.  Even though Sinkola had no training and had never bent rebar before the accident, he assumed he could figure out how to make four 90-degree bends using the rebar bender because he was "mechanically inclined."  (Sinkola, Wolfswinkel Tr.)

18.     Before the accident, Robyn Holloway had no training on how to use a rebar bender and had never watched anyone use a rebar bender.  Wolfswinkel never showed Robyn how to use a rebar bender or how to bend rebar.   (R. Holloway, Wolfswinkel Tr.)

19.     Before working on the B Street Substation wall, Sterling Holloway frequently worked with rebar in building walls and received training from All Power on how to bend rebar using a rebar bender.  Sterling had experience using All Power's rebar bender to bend rebar and this was the same rebar bender used during the accident.  Sterling bent rebar using All Power's rebar bender on most jobs for All Power.  (S. Holloway Tr.)

20.     At approximately 8:30 a.m. on Monday, October 17, 2011, Robyn Holloway was bending a 20-foot piece of rebar with Sinkola using All Power's rebar bender so that approximately 17.5 feet of rebar was placed vertically up in the air.  The rebar they were bending got stuck in the bender.  The 17.5 feet of rebar Robyn was holding vertically either contacted the energized busbars or came close enough to the energized busbars for the electricity to arc.  The energized busbars were approximately 17 feet 10 inches above the ground.  Only Plaintiffs,

Sinkola, and Wolfswinkel were present at the B Street site on October 17, 2011 before the accident occurred. (Undisputed Fact No. 7 [ECF No. 98 at 5]; Sinkola, R. Holloway, S. Holloway, Wolfswinkel, Philips Tr.)

21.     Robyn Holloway sustained burns over 50% of his body and was hospitalized for approximately six weeks at the University of California Davis Medical Center where he underwent grafting procedures and reconstructive surgery. (R. Holloway, Maguina Tr.; Exhs. TTT-3, TTT-4)

**B.     PLAINTIFFS' WITNESSES AND CONSTRUCTION EXPERT HUGHES**

1.     Plaintiffs presented the following witnesses in their case-in-chief: Duane Barker, Beale's Base Electrical Engineer in October 2011; Plaintiff Sterling Holloway; Lyn Phillips, Beale's Electrical Maintenance Supervisor; Sinkola; Plaintiff Robyn Holloway; Dr. Pirko Maguina, a surgeon who treated Robyn Holloway at U.C. Davis after the accident; Giorgi; Wolfswinkel; and Jeffrey Hughes, Plaintiffs' construction expert.

2.     Plaintiffs offered expert testimony on liability from Hughes. Hughes has no prior experience with electrical substations such as the B Street Substation. (Hughes Tr.)

3.     The Court gives little weight to Hughes' opinions because his opinions are not reliable, he was not credible, and his analysis was based on insufficient materials. For example, Hughes changed his testimony during cross-examination and then changed it again on re-direct, ultimately conceding that the location of the rebar on the ground inside the temporary fence was safe. Hughes would not answer questions posed and had to be asked the same question multiple times. He would not admit to facts in common knowledge such as the use of a shovel to flatten gravel or dirt. In reaching his opinions, Hughes admitted that (1) he did not review all the accident scene photographs; (2) he did not review or consider the testimony of Sinkola even though Sinkola bent the rebar in the accident with Robyn Holloway, testified at trial, and gave two depositions related to this accident; (3) he did not review or consider other prior testimony of both Plaintiffs and Anderson; (4) he did not consider the distance of the rebar located on the ground from the energized lines; and (5) he did not consider the fact that there are no energized lines above the location of the rebar on the ground. (Hughes Tr.; see Exhs. D-2 through D-48)

///

4.      Hughes opined that placing rebar on the ground inside the wall perimeter was not consistent with customary construction practices because the rebar should have been placed on the outside of the perimeter. This includes the area between the temporary fence and the perimeter. He testified that placing the rebar on the perimeter's inside created trip and fall hazards. (Hughes Tr.)

5.      Hughes testified that he believed Sinkola and Robyn Holloway selected the rebar bending location used in the accident because it was "more efficient" to bend the rebar in that location, and because even though other areas near the location of the rebar were further away from the energized lines, those areas were not level ground. (Hughes Tr.)

6.      Wolfswinkel testified that the rebar was located in the field south of the substation approximately 50 feet away from the temporary fence and was only moved from this location because of Giorgi's instruction to get the rebar "out of the field." Hughes opined that rebar is bent in the area next to where the rebar is located. As a result, Plaintiffs argue that but for Giorgi's alleged instruction, the rebar would have remained outside the temporary fence 50 feet away and would have been bent next to this location outside the temporary fence 50 feet away. (Wolfswinkel, Hughes Tr.)

7.      Plaintiffs' argument and Hughes' testimony are speculative and inconsistent with other testimony and the facts. Sinkola and Robyn Holloway did not bend the rebar used in the accident next to where the rebar was located.[6] Instead, Sinkola chose to move the rebar bender and the rebar away from where the rebar was located inside the temporary fence. Sinkola and Robyn Holloway chose to bend the rebar 30-45 feet away from where the rebar was located inside the temporary fence, either directly underneath or almost directly underneath energized lines. It is undisputed that the rebar bent in the accident was the first piece of rebar that was bent for the wall construction, so there was no prior rebar bending upon which to base Plaintiffs' argument. (Wolfswinkel, Hughes, Sinkola, R. Holloway Tr.)

---

[6]   In addition, the accident scene photographs show that on the day of the accident, some rebar was still located outside the temporary fence. Sinkola and Robyn Holloway did not bend rebar next to where any rebar was located outside the temporary fence. (Exhs. D-20, D-21, D-7, D-24, D-27)

8.      Plaintiffs' argument is also inconsistent with both Wolfswinkel's and Hughes' testimony.  They testified that the rebar was not bent outside the wall perimeter because carrying 20-foot rebar was difficult as the rebar would bow and drag on the ground.  This is inconsistent with Plaintiffs' argument that, but for Giorgi's alleged instruction, the rebar would have remained outside the temporary fence 50 feet away and would have been bent next to this location because this would require carrying each piece of rebar 50 feet to the temporary fence and another 15 feet from the temporary fence to the wall perimeter.  (Wolfswinkel, Hughes Tr.)

9.      The Court does not find Wolfswinkel to be credible.  Wolfswinkel testified that Giorgi instructed him to get the rebar out of the field south of the substation because there was a lot of foot traffic in the field.  But on cross-examination, Wolfswinkel admitted that there was no foot traffic in the field and that the field was vacant.  Wolfswinkel also testified that all the rebar was moved to the inside of the temporary fence after the alleged rebar instruction, but the accident scene photographs show that on the day of the accident, there was still some rebar located outside the temporary fence.  Wolfswinkel also testified that Giorgi's instruction was made the week of October 12-14, 2011.  Wolfswinkel admitted that in his prior depositions, he testified that he was sure he recorded Giorgi's instruction in All Power's daily reports that Wolfswinkel filled out.  But Wolfswinkel's daily reports for the week of October 12-14, 2011 do not include any reference to Giorgi's instruction and the report for October 13, 2011 states "None" regarding any inspector's comments.  None of the All Power daily reports for the B Street Substation wall construction include any reference to Giorgi's alleged instruction.  Wolfswinkel's testimony at trial also contradicted his prior deposition testimony, including his prior testimony that the alleged rebar instruction was the first time he had seen or spoken to Giorgi.  Wolfswinkel also testified in his first deposition, which was taken in May 2012 approximately seven months after the October 2011 accident, that the location of the rebar bending was based on where the crew was building the wall.  Wolfswinkel admitted that he made no mention of Giorgi or any instruction from Giorgi to move the rebar in this May 2012 deposition.  (Wolfswinkel Tr.; Exhs. G, D-20, D-21, D-7, D-24, D-27)

10.     The Court also finds that Plaintiff Robyn Holloway is not credible.  Robyn Holloway signed verified interrogatory responses under penalty of perjury in August 2014 stating

that he had a brain disorder, his left leg and foot were very weak, he had difficulty sitting and

standing, he did not have full range of motion in his left shoulder, he experienced full body

convulsions daily, back pain, and had difficulty sitting and standing.  He also testified under oath

in depositions in June 2014, July 2014, and September 2014 regarding his injuries and post-

accident condition, testifying that he was generally housebound and sedentary.  (R. Holloway Tr.;

Exh. EEEE(4)-22)

11.     But contemporaneous videos and photographs contradicted Robyn Holloway's

interrogatory responses and deposition testimony including August 2014 videos of him repeatedly

skateboarding and performing skateboarding tricks such as jumping, flipping, and rotating the

skateboard while skating; August 2014 and October 2014 videos of him performing construction

work, welding and grinding while on both knees on the ground, squatting bilaterally, lying on the

ground, and bending over, all while smoking; August 2014 videos of him carrying and spinning his

girlfriend while dancing and skipping; August 2014 videos of him lifting and rotating his left arm

above his shoulder and repeatedly pumping up bike tires using both arms and shoulders; and

August 2014 and October 2014 videos of him walking without a cane and without limping.  The

October 2014 videos showed him using a cane and limping only when going to and from the office

of his primary treating physician, Dr. Peter Abaci,[7] but otherwise walking without a cane and

without limping.  (R. Holloway Tr.; Exhs. L, M, EEEE(4)-23, EEEE(4)-24)

12.     At trial, Robyn Holloway's deposition testimony on other issues was contradicted

by videos, photographs, and certified court records.  For example, he testified in multiple

depositions that he drove "rarely" and "maybe once a month" because he had a stick shift car and

the problems with his left ankle and foot made it too difficult to drive.  August 2014 and October

2014 videos showed him driving his stick shift car multiple times over multiple days.  (R.

Holloway Tr.; Exhs. L, M, EEEE(4)-23)

13.     Robyn Holloway also testified in a June 2014 deposition that he traveled to

Phoenix, Arizona in August 2013.  On this trip, he testified that he only had enough medication for

---

[7]     Despite opposing the United States' evidentiary sanctions motion to exclude Dr. Abaci
from testifying at trial, Plaintiffs did not call Dr. Abaci as a witness at trial.  [ECF No. 128, 131]

one day and that he was assaulted in a one-sided fight. He testified that because of this one-sided assault, he had to get stitches and his psychologist recommended that he take legal action against his assailant. But certified court records from the Scottsdale City Court showed that charges were brought against Robyn Holloway in August 2013 for assault to intentionally cause physical injury, disorderly conduct, and being under the influence of alcohol/ drugs in public. The certified court records also included a copy of a November 2013 letter signed by Robyn Holloway where he informed the court that his "medication had been stolen" and that he was "permanently disabled, as deemed by social security and would be unable to commit to any additional classes because of [his] immobility." (Exh. EEEE(4)-20) The videos and photographs showed that he was not immobile in 2013, or even in 2012, given his two-week travel to Italy in March 2012, his travel to other destinations, and his drum and guitar performances for multiple rock bands. At trial, Robyn Holloway also conceded that he did not disclose this 2013 Arizona trip in his September 2014 deposition when asked about his post-accident travel. (R. Holloway Tr.; Exhs. L, M, EEEE(4)-11, EEEE(4)-14, EEEE(4)-23)

14. At trial on direct examination, Robyn Holloway testified that 10-12 months after he was discharged (November 2012 - January 2013), he started to play music "a little bit." On cross-examination, however, he admitted that in October 2012, he was performing as the drummer of a rock band called Dead Bull Pine and he identified himself playing drums in photographs from an October 2012 show. (R. Holloway Tr.; Exh. EEEE(4)-11)

15. In his September 2014 deposition, Robyn Holloway testified that he "used to play drums" and only plays "[m]aybe once or twice a month" for "10, 15 minutes." But videos and photographs showed him playing drums and performing in shows for rock bands beginning in 2012 and continuing through 2015. (R. Holloway Tr.; Exhs. EEEE(4)-1, EEEE(4)-3 through EEEE(4)-11) The Court does not find credible Robyn Holloway's attempt to explain one of the many photographs of him playing drums as a photograph where he was "posing" but not actually playing the drums.

16. Robyn Holloway testified in his June and July 2014 depositions that he was more comfortable wearing long sleeves because of the stigma from his scars and because he was gawked

at if shirtless.  But August 2014 videos and post-accident photographs showed him shirtless, including on the website for one of his rock bands (West) where he is pictured shirtless in his profile as West's drummer.  (R. Holloway Tr.; Exhs. EEEE(4)-3, EEEE(4)-18, EEEE(4)-23)

**C.    PLAINTIFFS FAILED TO PROVE BREACH**

1.    It is not necessary to determine whether Giorgi gave the alleged instruction to move rebar to the inside of the temporary fence because even if this instruction was given, there is no breach and no causation.

2.    It is undisputed that there was no instruction by the Air Force regarding where inside the temporary fence to move the rebar.  Instead, Robyn Holloway and Sinkola testified that they chose where inside the temporary fence to move the rebar, and Wolfswinkel testified that Giorgi's instruction was to get the rebar "out of the field."  Hughes also testified that he was aware that this fact was undisputed. [8]  (R. Holloway, Sinkola, Wolfswinkel, Hughes Tr.)

3.    Plaintiffs argue that the rebar that was moved to the inside of the temporary fence was moved on October 13 or 14, 2011. Pls. Opp. at 2 [ECF No. 154].  Given that Wolfswinkel's daily report for October 13, 2011 stated "none" for the inspector's comments, the Court finds that the rebar that was moved to the inside of the temporary fence was moved on October 14, 2011, the last working day before the accident.  (R. Holloway, Sinkola, Wolfswinkel, Hughes Tr.; Exh. G at 11-12)

4.    According to Wolfswinkel and Hughes, the location Robyn Holloway and Sinkola chose for the rebar was a tripping hazard and would get in the workers' way.  This is contradicted, however, by the placement of rebar piles next to the work area for Wolfswinkel's prior construction inside the B Street Substation, which also involved using rebar while the substation was energized.  (Wolfswinkel, Hughes Tr.; Exhs. FFFF(4)-1, FFFF(4)-4)

///

///

---

[8]    In their opposition, Plaintiffs initially state that the alleged instruction was to move rebar to the inside of the temporary fence, but then Plaintiffs argue that Giorgi instructed that rebar be placed "in close proximity to the energized lines." Pls. Opp. at 2:3-6, 2:23-25 [ECF No. 154].  This argument is not supported by the evidence.

5.     As shown in Exhibit D-20 and other accident scene photographs, there were many flat areas between the temporary fence and the wall perimeter that were available for staging and bending rebar.  (Exhs. D-15, D-20, D-21)



Exh. D-20

6.     Hughes opined that placing rebar on the ground inside the wall perimeter was not consistent with customary construction practices because the rebar should have been placed on the outside of the perimeter, which includes the area between the temporary fence and the perimeter. He testified that placing the rebar on the perimeter's inside created trip and fall hazards.  (Hughes Tr.)

7.     In addition to the flat areas already present inside the temporary fence as shown in Exhibit D-20 above, All Power could have moved the temporary fence panels to expand the area enclosed, to move or flatten any dirt, and/or to place the rebar between the temporary fence and the wall perimeter.  The temporary fence was made up of individual, moveable panels.  One person can move a temporary fence panel himself.  Any fence panel can be made to swing open and shut to create a gate into the temporary fence.  The gate can be moved to different locations in the temporary fence.  (Sinkola, Wolfswinkel, Giorgi, R. Holloway, Hughes Tr.; Exhs. D-20, D-47 (shovels pictured))

///

8.	All Power had a backhoe and shovels to move and flatten dirt and small rocks inside the temporary fence.  Wolfswinkel was a backhoe operator and had previously operated it to dig the trenches for the wall.  All Power's shovels were located at the job site near the 20-foot rebar. (Sinkola, R. Holloway, Wolfswinkel Tr.; Exh. D-47)

9.	Though the Court does not find Hughes credible, regardless, Hughes' testimony regarding the customary construction practice cannot establish breach by the Air Force because it was All Power who chose not to follow the construction practice.  All Power chose not to place the rebar in the flat areas between the perimeter and temporary fence, chose not to flatten other areas inside the temporary fence, and chose not to expand the moveable temporary fence.  Instead, All Power took the quickest and easiest option.  In addition, some rebar was still located outside the temporary fence on the day of the accident and it is unclear how there could be breach when some rebar remained outside the wall perimeter.  (Exhs. D-7, D-20, D-21, D-24, D-27)

10.	Hughes also testified that the work area would be safe if the staging area and work zone were outside the line clearance by a distance of more than 10 feet.  Hughes testified that the rebar was safe where it was located on the ground on the day of the accident.  He agreed that the location where Robyn and Sinkola placed the rebar on the ground inside the temporary fence was not under any energized lines and that the rebar was located 30 to 45 feet away from the energized lines.  (Hughes Tr.)

11.	Hughes conceded that the electricity would not arc from the power lines all the way down to the ground where the rebar was placed.  Hughes further conceded that picking up rebar 20 feet away from the wires is "a lot different" than picking up rebar directly beneath the energized wires.  (Hughes Tr.; Exh. D-15 (see below))

12.	Hughes further agreed that there is no requirement that the B Street Substation's high voltage lines be insulated.  (Hughes Tr.)

D.	NO CAUSATION – WHERE REBAR WAS BENT CAUSED THE ACCIDENT

1.	It is undisputed that there was no instruction by the Air Force about the rebar bender or where any work involving rebar was to take place.  (Wolfswinkel Tr.)  It is further

///

1  undisputed that there was no instruction by the Air Force on where rebar bending should take
2  place.  (Sinkola, R. Holloway, S. Holloway, Wolfswinkel Tr.)

3  2.  As Sinkola and Robyn Holloway both testified, it is undisputed that Sinkola and
4  Robyn Holloway chose where to bend the rebar.  They did not consult with anyone else in
5  choosing this location.  (Sinkola, R. Holloway Tr.)

6  3.  As shown in Exhibit D-15, the rebar that was moved to the inside of the temporary
7  fence was not located under energized lines.  It was located approximately 30 feet away from the
8  lattice structure that is not energized and approximately 45 feet away from the energized lines.
9  (Giorgi, Hughes Tr.; Exhs. D-12, D-15)



Exh. D-15
Dobie blocks and rebar
in the southeast corner.

21  4.  Sinkola testified that on the morning of the accident, the rebar bender was located
22  next to the dobie blocks in the southeast corner of the wall.  (Exh. D-15 above)  Unfortunately,
23  Sinkola chose the worst location possible to move the bender.  Despite the rebar bender and the
24  20-foot rebar's location in the southeast corner of the wall far from the energized lines, Sinkola
25  moved both the bender and the rebar <u>towards</u> the energized lines to almost directly underneath the
26  energized lines for bending.  (Sinkola, R. Holloway Tr.; Exh. D-15)

27  5.  As shown in the accident scene photographs, including Exhibits D-12, D-15, and
28  D-47, there was a significant amount of space within the temporary fence that was <u>not</u> underneath

the energized busbars where rebar could have been bent safely without the possibility of electrical arcing. For example, Sinkola and Robyn could have carried the rebar bender and rebar a shorter distance by walking towards the parking lot away from the energized lines where there was ample space by the wooden forms. This also disproves Hughes' testimony that the bending location Sinkola and Robyn Holloway chose was for efficiency.

6. As Plaintiffs conceded, if Sinkola and Robyn Holloway had bent the rebar the exact same way—placing 17.5 feet of rebar vertically up into the air— even just one or two steps away from the busbars, there would have been no electrical arcing.[9] (Hughes Tr.)

7. The energized lines are approximately 30-40 feet above the ground just one step away from the busbars. With each step you take towards the parking lot located east of the substation, the higher up the energized lines are located. (Giorgi, Hughes Tr.; Exh. D-12)



Exh. D-12
The energized lines are outlined in yellow.

///
///
///
///
///
///

[9] Plaintiffs conceded this point at the February 28, 2017 hearing.

FINDINGS OF FACT AND CONCLUSIONS OF LAW- *Holloway v. U.S.*, No. 12-cv-02120 MCE-CKD    16

8.     All Power's shovels were located at the job site near the 20-foot rebar, but the All Power crew did not use the shovels to flatten the ground to create a flat surface for the rebar bender.  The rebar bender is only approximately 3.5 to 4 feet long.  (Exhs. I, D-15, D-47 (shovels); S. Holloway, Sinkola, R. Holloway, Wolfswinkel Tr.)



**Exh. D-47**
Flat area where group is standing.
     All Power's shovels

9.     On cross-examination, Hughes testified that he did not agree that shovels could be used to flatten out gravel to create a flat surface for bending rebar.  Hughes testified that it would be inefficient to use shovels to flatten gravel or small rocks and doing so "was not in [All Power's] contract."  Hughes' testimony is not credible because a shovel's purpose is to move and flatten dirt or rocks.  (Hughes Tr.)

10.     Sinkola and Robyn Holloway knew that the substation was energized while they were working on the wall.  Just two weeks before the accident, the All Power crew had a safety meeting on high voltage dangers.  (Sinkola, R. Holloway Tr.; Exh. G at 9)

11.     In addition to the extensive area inside the temporary fence available for rebar bending, rebar could have been bent using the bender outside the temporary fence in the parking lot or in the vacant field south of the substation.  (Wolfswinkel, Hughes Tr.)  Rebar was also located outside the temporary fence on the day of the accident, including right outside the southern

side of the temporary fence and in the vacant field south of the substation. (Exhs. D-7, D-20, D-21, D-24)

**E.      NO CAUSATION – HOW REBAR WAS BENT CAUSED THE ACCIDENT**

1.      It is undisputed that there was no instruction by the Air Force regarding how to bend rebar. (Sinkola, R. Holloway, Wolfswinkel, Giorgi Tr.)

2.      The rebar bent in the accident on October 17, 2011, was the first piece of rebar bent for the wall. Because All Power ordered pre-bent rebar for use in the wall, bending rebar was not expected for the construction of the wall. The only time rebar was bent for the wall was to go over a culvert found in the trench. The culvert found in the trench by All Power was not anticipated. (R. Holloway, Giorgi, Wolfswinkel, Hughes Tr.)

3.      Sinkola and Robyn Holloway bent the 20-foot rebar so that approximately 17.5 feet of rebar was placed vertically up in the air. The rebar they were bending got stuck in the bender. (Sinkola, R. Holloway Tr.) The 17.5 feet of rebar Robyn was holding vertically either contacted the energized busbars or came close enough to cause the electricity to arc. (Phillips, Wolfswinkel Tr.)

4.      It is undisputed that there was no electrical injury until Sinkola and Robyn put 17.5 feet of rebar vertically up in the air under the energized busbar lines. (Phillips, Hughes Tr.)

5.      Before the accident, Sinkola had never bent rebar, never used a rebar bender, and had no training on how to use a rebar bender. Before the accident, Robyn Holloway also had no training on how to use a rebar bender and had never watched anyone use a rebar bender. Though Sterling Holloway had training and experience bending rebar using All Power's rebar bender before the accident, the task of bending rebar to go over an unanticipated culvert was improperly assigned to Sinkola by Wolfswinkel. (S. Holloway, R. Holloway, Sinkola, Wolfswinkel, Hughes Tr.)

6.      Hughes conceded that had bending rebar been assigned to Sterling, who had experience bending rebar with a bender, "[i]t would have helped" prevent the accident. (Hughes Tr.)

///

7.      All Power was responsible for training its employees on how to use construction tools such as a rebar bender, but failed to train Sinkola and Robyn Holloway on rebar bender use before Wolfswinkel assigned the task of rebar bending to them.  (Hughes, Wolfswinkel, S. Holloway, R. Holloway, Sinkola, Tr.)

8.      All Power had a mason crew and a head mason.  Hughes agreed that an experienced mason would be able to provide rebar bender training, including to Sinkola and Robyn Holloway. (Wolfswinkel, R. Holloway, Hughes Tr.)

**Exh. D-5**



## F.      NO CAUSATION – REBAR GOT STUCK IN ALL POWER'S REBAR BENDER

1.      The rebar bent in the accident got stuck in All Power's rebar bender when Robyn Holloway tried to remove the rebar.  (R. Holloway, Sinkola Tr.)

2.      On the day of the accident, All Power's rebar bender was attached to a wooden platform with rusty nails, but should have been attached with bolts.  All Power's rebar bender was also rusty.  (Hughes Tr.; Exh. D-5)

3.      Hughes testified that rebar can get stuck in a bender that has not been properly maintained.  All Power is responsible for properly maintaining its rebar bender.  After inspecting All Power's rebar bender at trial, Hughes concluded that the bender was loose in certain places but was not sure whether it was loose in October 2011.  (Hughes Tr.; Exhs. I, D-5)

## G.      NO CAUSATION - WOLFSWINKEL FAILED TO STOP SINKOLA & ROBYN

1.      All Power has the responsibility for overall safety of the job site as well as the safety of All Power's employees.  Wolfswinkel and Hughes testified that Wolfswinkel, as the foreman, was responsible for enforcing all job site safety related matters.  Wolfswinkel was also responsible for supervising Plaintiffs and Sinkola for safety.  (Wolfswinkel, Hughes Tr.)

2.      Before the B Street wall construction, Wolfswinkel had experience supervising workers bending rebar.  (Wolfswinkel Tr.)

3.      Only Plaintiffs, Sinkola, and Wolfswinkel were present at the B Street site on October 17, 2011 before the accident occurred.  (Sinkola, R. Holloway, S. Holloway, Wolfswinkel Tr.)

4.      Wolfswinkel arrived at the B Street job site 10 to 15 minutes before the accident. He was laying out rebar by the wall perimeter.  Though he had direct sight of Robyn Holloway and Sinkola, and was talking to them before the accident occurred, Wolfswinkel failed to stop them from bending rebar under the energized busbars and failed to stop them from putting 17.5 feet of rebar vertically up in the air.  The rebar Robyn bent either touched the energized busbar or came close enough so that the electricity arced.  (Wolfswinkel Tr.)

## CONCLUSIONS OF LAW

1.      Plaintiffs filed suit under the Federal Tort Claims Act ("FTCA") alleging negligence by the United States based on the alleged instruction by Staff Sergeant Brian Giorgi to Wolfswinkel to move rebar within the temporary fence surrounding the B Street substation. California law governs the determination of liability of this FTCA action because the alleged tort occurred in California.  *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994).

2.      Plaintiffs have the burden to prove negligence by a preponderance of the evidence and must prove all of the following elements:  "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury." *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996) (emphasis omitted).

3.      As the fact finder, the Court assesses the credibility of witnesses and determines the weight to give a witness' testimony, including expert witnesses.  *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility.  The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.");  *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1104 (9th Cir. 2010) (following a bench trial, "[t]he district court found this expert credible, and we are extremely deferential to credibility determinations.");  *Myers v. United States*, 2016 WL 7438644, at *3 (9th Cir. Dec. 27, 2016) (affirming judgment for the government where breach did not cause injuries in FTCA case and

concluding that the district court, as the fact finder, decides credibility of expert witness);

*Badillo v. City of Stockton*, 956 F.2d 884, 891 (9th Cir. 1992) (affirming dismissal granted at close of the plaintiffs' case where the court found that plaintiffs failed to prove a required element and where the district court found the plaintiffs' expert was biased and not credible).

4. For the reasons described above, including Hughes' refusal to admit to facts in common knowledge such as the use of a shovel to flatten gravel or dirt,[10] the Court finds that Hughes is not credible. The Ninth Circuit has affirmed the district court's findings regarding an expert's lack of credibility for experts who, like Hughes, fail to answer questions straightforwardly and "tr[y] to answer the questions he wanted to answer, rather than the questions asked." *Folden v. Wash. State Dep't of Soc. & Health Servs.*, 744 F. Supp. 1507, 1522-23 (W.D. Wash. 1990) (finding the plaintiff's expert witness was not credible where the expert "left out data that should and could have been included" and "kept changing the questions that he was asked on cross-examination instead of answering them straightforwardly. He tried to answer the questions he wanted to answer, rather than the questions asked."), *aff'd*, 981 F.2d 1054, 1058 (9th Cir. 1992) (affirming district court's finding that the plaintiff's expert witness was not credible and concluding that findings "in fact, are clearly supported by the record"). In addition, Hughes' opinions are not reliable because they are based on insufficient materials and analysis because he appeared to have reviewed selective evidence and testimony (e.g., he did not review either of Sinkola's depositions and did not review all the accident scene photographs). *See* Fed. R. Evid. 702.

5. While the Court does not give weight to much of Hughes' expert testimony, the Court agrees that Sinkola and Robyn Holloway were responsible for ensuring that they were working in a safe manner. The United States was entitled to expect that they and other All Power employees would use reasonable care. *See* Cal. Civ. Code § 1714(a); *Tucker v. Lombardo*, 47 Cal. 2d 457, 467 (1956).

///

---

[10] At the hearings on the Rule 52(c) motion, Plaintiffs conceded that All Power's shovels could have been used to flatten the ground for the rebar bender.

6. The evidence also establishes that All Power decided where inside the temporary fence to move the rebar. All Power could have, but did not, (i) move the rebar to flat areas between the temporary fence and perimeter, (ii) expand the temporary fence to create more space between the temporary fence and perimeter, or (iii) flatten or move dirt between the temporary fence and perimeter so rebar could be placed in this area. Further, Hughes agreed that where the rebar was placed on the ground was safe and that the electricity could not arc from the lines all the way down to the ground where the rebar was placed. (Hughes Tr.)

7. Therefore, there is no breach of any claimed construction standard.

8. With respect to causation, Plaintiffs must prove that Giorgi's alleged instruction to move the rebar to the inside of the temporary fence was a probable, not merely a possible, cause of Robyn Holloway's electrical injury. *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal. App. 3d 396, 402-403 (1985); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1320 (9th Cir. 1995). "To establish causation, a plaintiff must prove that the defendant's conduct was a 'substantial factor' in bringing about his or her harm. Stated differently, evidence of causation 'must rise to the level of *a reasonable probability based upon competent testimony*. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." *Bowman v. Wyatt*, 186 Cal. App. 4th 286, 312 (2010) (reversing because no substantial evidence of proximate causation) (internal citations omitted and emphasis in original).

9. "Proof of causation must be by substantial evidence, and evidence which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient." *Dixon v. City of Livermore*, 127 Cal. App. 4th 32, 43 (2005) (reversing judgment because causation was speculative) (citations and internal quotation marks omitted). Expert opinion on causation that is based on inferences, speculation, or conjecture is insufficient to establish causation. *Saelzler v. Advanced Group 400*, 25 Cal. 4th 763, 775 (2001).

10. Here, even assuming without finding that Giorgi gave the rebar instruction, Plaintiffs cannot prove causation by substantial evidence because there is not an "absence of other reasonable causal explanations"— there are many other actual causal explanations. *See Bowman*,

186 Cal. App. 4th at 312. Plaintiffs conceded that if Sinkola and Robyn had bent the rebar in a different location, even just a step or two away from the energized lines, the electrical injury could not have occurred. Plaintiffs further conceded that if Sinkola and Robyn had bent the rebar with the short end pointed up, or 2.5 feet of rebar vertical rather than 17.5 feet of rebar vertical, the electrical injury could not have occurred.[11] The alleged rebar instruction does not reach the level of a probable cause of Robyn Holloway's electrical injury because there is less than a probability that the electrical injury resulted from the rebar instruction. *See Bowman*, 186 Cal. App. 4th at 312.

11. In addition, the electrical injury would not have occurred had All Power trained Sinkola or Robyn to use a rebar bender, or if Wolfswinkel had properly supervised them. Hughes agreed that it was All Power's responsibility to train its employees on how to use construction tools and that it was Wolfswinkel's responsibility to supervise Plaintiffs and Sinkola for safety. Wolfswinkel was at the job site for 10-15 minutes before the accident, had direct sight of Sinkola and Robyn, was speaking to them, but failed to stop them from bending rebar incorrectly underneath energized lines. Wolfswinkel also should have assigned the rebar bending task to Sterling, who actually had experience and training using a rebar bender and who was present at the job site.

12. Hughes and Wolfswinkel agree, as they must, that rebar had to come inside the temporary fence because it is undisputed that (i) the wall being built was inside the area enclosed by the temporary fence, and (ii) rebar had to be used to build the wall. Wolfswinkel and Anderson chose where to place the temporary fence. The statement by Barker in Exhibit 34 that "All rebar and rebar work should have been done outside of the fence" has been proven to be incorrect by undisputed facts and the testimony of Hughes, Wolfswinkel, and Giorgi. Barker's statement does not have any bearing on causation. In addition, Barker is not responsible for the operation of the B Street Substation, he would drive by the project site approximately twice a week, and he never

///

_____

[11] Plaintiffs conceded these points at the Rule 52(c) hearings.

discussed rebar or rebar bending with All Power. (Exh. B-3 (wall design required the placement of rebar within the wall at multiple stages of construction); Hughes, Wolfswinkel, Giorgi, Barker Tr.)

13.   The alleged rebar instruction is not a probable cause because it is not more likely than not that Robyn Holloway's electrical injury was a result of the rebar instruction. *See Bowman*, 186 Cal. App. 4th at 312. It is undisputed that Giorgi never gave any instruction regarding where inside the temporary fence to place the rebar, any instruction regarding the rebar bender, any instruction regarding where to bend rebar, or any instruction regarding how to bend rebar. There were substantial areas within the temporary fence where rebar bending would have occurred safely without any possible electrical arcing.

14.   All Power had shovels nearby to easily create a flat surface on which to place the rebar bender. The Court rejects Hughes' testimony to the contrary as not credible. The whole purpose for a shovel is to move or flatten dirt or rocks, and Plaintiffs conceded that the shovels could have been used to flatten the ground for the rebar bender.

15.   For the reasons above, the "combined causes" analysis in cases like *Yanez v. Plummer* that Plaintiffs cite in their opposition does not apply because the "combined causes" analysis applies when there is no cause that "is sufficient" by itself to have resulted in the injury and there is "a combination of causes dependent on one another." *Yanez v. Plummer*, 221 Cal. App. 4th 180, 186-87 (2013) ("In a legal malpractice action where, as here, there is a combination of causes, none of which is sufficient without the others to have caused the harm, the test for causation is the 'but for' test: but for the defendant's conduct, the harm would not have occurred. Because the 'substantial factor' test of causation subsumes the 'but for' test, the 'but for' test has been phrased in terms of 'substantial factor,' as follows, in the context, as here, of a combination of causes dependent on one another."); *see* Pls. Opp. at 3-4 [ECF No. 154].

16.   For the reasons described above, the Court finds that Plaintiffs' causation argument based on Hughes' opinion and Wolfswinkel's testimony that the rebar bent in the accident would have been bent outside the temporary fence if no instruction to move rebar had been given, is speculative and inconsistent with the facts. *See Moore v. Robinson Oil Corp.*, 588 F. App'x 528, 530 (9th Cir. 2014) (holding that where the district court found the plaintiff's expert to not be

credible in a bench trial, district court had discretion to reject the expert's untested speculation); *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502-503 (9th Cir. 1994) (affirming exclusion of expert testimony because expert's "subjective belief and unsupported speculation" are improper bases for expert's causation opinions and because experts formed opinions "before reading the relevant literature, even though they admitted that they were not sufficiently familiar with the field"). Sinkola and Robyn Holloway did not bend the rebar used in the accident next to where the rebar was located, and it is speculative to assume that they would have bent the rebar next to where the rebar was located if the rebar had been located 50 feet outside the temporary fence.

17.     Even Plaintiffs' own expert agreed that where the rebar was placed on the ground was safe and that the electricity could not arc from the lines all the way down to the ground where the rebar was placed.  (Hughes Tr.)

18.     Therefore, Plaintiffs Robyn and Sterling Holloway failed to prove that Robyn Holloway's electrical injury was caused by any negligent act of the Air Force.  Sterling Holloway's bystander claim, which is dependent on Robyn Holloway's claim, also necessarily fails.

IT IS SO ORDERED.

Dated:  May 4, 2017

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE